FILED
04/09/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 3, 2020

# IN RE ELI S.[1]

**Appeal from the Juvenile Court for Bedford County**
**No. 2018-JV-332     Charles L. Rich, Judge**

_____

## No. M2019-00974-COA-R3-PT

_____

In this termination of parental rights case, both parents appeal the trial court's termination of their parental rights to their son upon numerous statutory grounds and upon its finding that termination was in the child's best interest. Upon our review, we conclude that the record contains clear and convincing evidence supporting the trial court's determinations with respect to certain grounds though not others and that termination was in the best interest of the child. Accordingly, we reverse portions of the court's order finding that certain grounds for termination were established, affirm the remainder of the grounds and the best interest determination, and affirm the termination of Mother's and Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J. joined.

Richard L. S., Whiteville, Tennessee, Pro Se.[2]

Rebecca A. Robinson, Shelbyville, Tennessee, for the appellant, Savannah S.

Herbert H. Slatery, III, Attorney General and Reporter; Jeffrey D. Ridner, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] This Court has a policy of protecting the identity of children by initializing the last names of the parties.

[2] Father's attorney moved to withdraw contemporaneously with filing Father's brief; the motion was granted and no other counsel has entered an appearance for Father.

# OPINION

## I.    FACTUAL AND PROCEDURAL HISTORY

Eli S. was born on March 7, 2015 to Savannah S. ("Mother") and Richard S. ("Father"), who are not married. The Department of Children Services ("the Department" or "DCS") became involved with the family in October 2016 due to a referral that Eli's older half-brother, Tyler, who lived with Mother and Eli, was being exposed to drugs at the home. At the time, Father was incarcerated. With the help of the Department, Mother received in-home services through November 2016. On December 13, 2016, Mother was arrested and held in jail on charges of manufacturing methamphetamine. Eli was found to be with his maternal grandmother by the Department's investigator, who filed an affidavit in juvenile court to bring him into protective custody of the Department; on December 15, by ex parte order, he and Tyler were brought into protective custody and entered foster care. At that time, Tyler was in a detention facility.

On December 19, the Department filed a Petition in the Juvenile Court for Bedford County to adjudicate Eli and Tyler dependent and neglected due to "their parents use of illegal drugs, abandonment due to incarceration, and because they were within a structure wherein the act of creating methamphetamine was occurring"; they were so adjudicated by order entered October 17, 2017. The order recited that Mother waived the adjudicatory hearing and stipulated that the facts alleged in the Petition were true and constituted severe child abuse, perpetrated by Mother; the court relieved the Department of the obligation to use reasonable efforts to reunite the children with Mother and ordered that the children not be returned to Mother absent a judicial finding by clear and convincing evidence that there was no longer a danger to the children.

Two permanency plans which were developed by DCS in the record are dated August 2017 and March 2018; both plans were ratified by the court. Both plans contained the following responsibilities for both parents: complete an alcohol and drug assessment and follow all recommendations; complete a mental health intake and follow all recommendations; resolve all outstanding legal issues; submit to random drug screens; not expose Eli to any persons who are intoxicated or have a history of violence; secure housing that is appropriate and safe environmentally; have the financial means to support Eli. The August 2017 plan also imposed an obligation on both parents to provide DCS with information regarding potential relatives who could serve as caregivers to Eli. The August 2017 plan had dual goals of "return to parent" and "exit custody with relative"; the March 2018 plan had the sole goal of adoption.

The Department filed a petition to terminate both parents' rights to Eli on March

8, 2018.[3]  The petition alleged that termination was warranted on the grounds of abandonment by failure to provide a suitable home; abandonment by incarcerated parent and engaging in conduct prior to incarceration exhibiting a wanton disregard for Eli's welfare; substantial noncompliance with the permanency plans sections; confinement under a 10-year sentence when the child was under the age of 8; failure to assume legal and physical custody; and persistence of conditions. As to Mother, the petition also alleged the ground of severe child abuse.  The petition alleged that termination was in the best interest of Eli.

Both parents filed answers; Father admitted that grounds for termination existed but denied that termination was in the best interest of Eli.  Mother denied various allegations of the petition concerning both the statutory grounds and that termination was in Eli's best interest.  Trial was held on February 1, 2019, at which six witnesses testified.

## II.    EVIDENCE PRESENTED AT TRIAL

Kate Presnell, who worked as a DCS investigator in Shelbyville, testified that she first became involved with the family in October 2016 after her department received a "referral with concerns about meth use and production."  She testified about her interviews and interactions with the family and that she referred Mother to a 60-day intensive in-home program to help deal with her addiction as well as "with setting up boundaries and how to parent children"; that she "did end up getting one clean drug screen from [Mother] . . . at the end of November 2016"; that she closed her case with the family at the end of November 2016, and became involved with them again six days later when Tyler, who was 14 years old at the time, tested positive for methamphetamine after appearing to be under the influence while at school. Shortly thereafter, when Mother was arrested for manufacturing methamphetamine, Ms. Presnell testified that she began to search for Eli, and when she located him, he was brought into protective custody by order of the juvenile court and placed with a foster parent.  Ms. Presnell testified that, in the course of her investigation, Mother told her that "Eli was brought into the home after the methamphetamine was cooked."

Mr. Edward Linton, family services worker with DCS, testified that he was assigned Eli's case shortly after he came into protective custody on December 15, 2016, and worked the case until early October 2017.  Mr. Linton discussed his initial interaction with Mother, during which she appeared "very disheveled," with "dark circles under her eyes" and told him she "was having trouble sleeping"; that Mother told him in February 2017 that she had been accepted at Buffalo Valley treatment center for drug treatment and that he was impressed that Mother "took the initiative to check on Buffalo Valley . . . when . . . it's a difficult road to change to a sober lifestyle . . . but she seemed like she – she wanted that."

---

[3] The rights of Mother with respect to her older child, Tyler, are not at issue in this proceeding.

Mr. Linton testified that "the initial perm[anency] plan was developed within the first 30 days"; that he went over the responsibilities of Mother, which were the same as set forth in the August 2017 permanency plan.[4]  Mr. Linton testified that he met with Mother again in March and August 2017.  Mr. Linton testified that the initial plan imposed the same requirements on Father, who understood the requirements of the plan but "wasn't as focused on the requirements as he was on the need to get out of incarceration."  He also testified that Father "asked a lot about . . . Tyler, who's not his son but his stepson, but he did not ask that much – as much about Eli or about the welfare or what was going on with [Mother]."  Mr. Linton testified that both parents were incarcerated the entire time he had the case and that it was "very difficult" to provide services for the parents during their incarceration, though he did meet with them to "find out their needs and assess what was going on and prep work for if they were released."

Mr. Linton testified that while in the care of his foster parent, Eli "always appeared to be happy" and was "a very cute, active child, solid built"; that his relationship with his foster mother as "very strong" and  that she "is a committed advocate for Eli"; that Eli seemed to be very well cared for in the foster mom's home, which was "calm and spacious"; and that if Eli was taken away from the foster mother's home, it would be a "shock" to Eli.

Kimberly Goney, family services worker for the Department, testified that she was assigned Eli's case in November 2017, at which time both parents were incarcerated, and that she had never met with Mother or Father but sees Eli "at least twice a month."  She testified that she created a revised parenting plan in March of 2018 which added the requirement that the parents "not expose Eli to any persons using illegal substances, as well as submit to random drug screens"; that the parents had remained incarcerated throughout the time that she was the family services worker and had not completed any of the requirements of the permanency plans; that she had not been able to provide any services to them while they were incarcerated, and that the Department had been relieved of the requirement to use reasonable efforts to reunite Eli with Mother due to the severe abuse adjudication against her.  She testified that neither parent has any type of relationship with Eli and that neither has seen him since he came into protective custody.  Ms. Goney testified that from her visits with Eli, he appears to be a "very happy, healthy three-year-old boy."

Mother testified as to the criminal charges to which she pled guilty and the sentences she received; that she had been granted parole and "ha[s] a bed waiting for [her] at Doors of Hope."  Judgments entered into evidence show that she pled guilty on March 2, 2018 to felony charges of promotion of methamphetamine manufacture and initiation of process in the manufacturing of methamphetamines; she was sentenced to

---

[4] The initial permanency plan is not in the record.

three years on the first charge and ten years on the second, to run concurrently with the three-year sentence.

Mother testified that her drug of choice was marijuana, and that before she was arrested for manufacturing methamphetamines, she had been using meth for "maybe a year," starting "not too long after Eli was born" and using it "[s]ometimes every other day"; that she stopped using methamphetamines during the period that she had in-home services so that she could pass the drug screens; that she was not the one making methamphetamine in December 2017 but that she allowed a man to manufacture it in her home.[5]

Mother testified that she met with Mr. Linton and later Ms. Goney to develop the permanency plans and that she understood the requirements of the plans. With respect to the plans' requirements, Mother testified that she had been taking care of her legal responsibilities, gained lawful employment by working in the kitchen of the prison every day, for 40 hours per week at a rate of 17 cents an hour, and that she was "pretty sure they did a mental health intake and A[lcohol]&D[rug] assessment when [she] got into prison"; and that she had been attending a "hope recovery class which is an NA class" and was also in parenting classes. When questioned further, Mother requested and was granted 30 days to supply paperwork showing that she had had a drug and alcohol assessment and a mental health intake.[6] Mother also testified that she loved her children and was doing "everything possible to better myself so I can be a parent to them, a better parent to them and get them back and regain my bond with them"; that she had been keeping in contact with Eli and sent him Christmas presents; and as follows:

---

[5] In the order terminating the parents' rights, the court credited Ms. Presnell's testimony that Mother "had admitted to her that [Mother] had been making methamphetamine in the house where the kids were living and that she would bring the children back into the house afterward."

[6] The record contains papers from Mother that includes a memorandum from her supervisor in the kitchen who described her as "reliable and respectful" and said that she works Wednesday through Sunday; a "drug test results" list, containing two negative drug screens in November and December 2018; an "Offender Hearing Decision Notification" from the Board of Parole showing their final decision of "recommend past release date"; a program assignment notice showing that Mother was enrolled in "group therapy," which she described as a "substance abuse class." No drug and alcohol assessment or mental health intake is included in the record; however, the termination order states that:

> [Mother] supplied the Court with a late-filed exhibit on March 5, 2019, entitled Mental Health Intake Appraisal completed upon her arrival at the Tennessee Department of Correction. This intake reflects that [Mother] reported long-time use of methamphetamine, from ages 23 to 31, despite her testimony that she had only being using methamphetamine for about a year at the time of her arrest in 2016. The intake was performed on August 1, 2018 by E. Glenn Barnes, Ed. D., in order to determine if [Mother] was suitable for the general population of the prison and does not meet the requirements of an alcohol and drug evaluation or mental health evaluation.

I believe if given a chance, I -- once I'm out, which shouldn't be too much longer now, I will be able to provide a place for my child to be at. I will stay away from all the drug influence and people like that. And I have this program that is going to help me ensure all this.

Father testified that he has been in and out of incarceration since 2011 and, at the time Eli was born, was on probation for the manufacture, delivery, and sale of methamphetamine. He testified that he was present for Eli's birth and that he, Mother, and Eli lived together until his probation was revoked "[b]ecause [he] was incarcerated on a felony possession of a firearm." He testified that he had been continuously incarcerated since August 7, 2016 and that in February of 2017, he was sentenced to serve a four year sentence for which he had previously been granted probation, to be served consecutive to an eight year sentence.

Certified judgments showing Father's criminal history shows that he pled guilty in July 2012 felony charges of the initiation of process in the manufacturing of methamphetamines and to the manufacture, delivery, and sale of methamphetamines, for which he was sentenced to eight years, with all but six months of each sentence suspended and Father put on probation. In February 2017, Father violated his probation and was required to serve the eight-year sentence that was originally imposed. On December 5 2013, Father pled guilty to the manufacture of methamphetamine, and was sentenced to five years, 12 months of which was to be served and then he would be released to five years of supervised probation; in March 2017, Father was found to have violated the terms of his probation and his five-year sentence was put into effect. In February 2017, Father pled guilty to being a convicted felon in possession of a weapon for which he was sentenced to four years, which was suspended and he was placed on four years of probation; this sentence was to be consecutive to the sentence he received that month.

Father testified that Mr. Linton explained the terms of the permanency plan to him, which he understood; that he is "on a waiting list to get into a therapeutic community in TDOC custody"; and that he was taking classes and "bettering [him]self while [he's] here [in prison]." Father did not elaborate on the classes he was taking or submit documentation evidencing his enrollment. He also testified that he had given Mr. Linton and Ms. Presnell the names of his mother and sister in hopes of placing Eli with them, and expressed frustration that they were not considered as potential placements.

Ms. Susan J., Eli's foster parent, testified that she had been Eli's foster care placement since December 15, 2016. She testified about the day that 19-month-old Eli came into her care, explained the nature of their relationship, and gave various examples of how it has grown; that Eli is the only child in her home and that he is "very much" a part of her extended family and showed the court numerous photos of him with her niece and nephew and other cousins during different holidays and at various family gatherings

on the farm where she and her sister both have houses, as well as with her two dogs; Ms. J. testified about Eli's dental needs and how he had to be put under anesthesia to put caps on several of his back teeth due "a lot of softening."

She testified that Mother had occasionally written letters to Eli, which she read to him, and that Father had not written letters. She testified that she wished to adopt Eli and had space in her home and suitable finances to provide for him; that she was adopted herself; and that she would facilitate communication between Eli and his birth parents, if she were allowed to adopt him, because she "want[s] him to know everybody."

### III. THE RULING OF THE TRIAL COURT

An order was entered on April 29, 2019, in which the court found the following grounds for termination were proven as to both Mother and Father: abandonment by failure to provide a suitable home (Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(ii)); abandonment by an incarcerated parent whose conduct prior to incarceration exhibits a wanton disregard for the welfare of the child (sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv)); substantial noncompliance with the permanency plans (sections 36-1-113(g)(2) and 37-2-403(a)(2)); confinement under a 10-year sentence when the child was under the age of 8 (section 36-1-113(g)(6)); failure to assume legal and physical custody (section 36-1-113(g)(14)); and persistence of conditions (section 36-1-113(g)(3)). As to Mother, the court also held that the evidence established that she had severely abused Eli (section 36-1-113(g)(4)). The court also made findings with respect to the best interest factors at Tennessee Code Annotated section 36-1-113(i), concluded that factors (1), (4), (5), (6), and (7) were applicable, and held that termination was in Eli's best interest.

Both Mother and Father appeal. Father challenges the conclusion that he had abandoned Eli due to his incarceration under a sentence of ten years or more. Mother challenges the court's best interest determination.[7] In our review, we are obliged to

---

[7] Mother also raises the issue of whether "Counsel for Appellant fail[ed] to act in an effective manner in assisting her in supplying documents to demonstrate her efforts to comply with the permanency plan and effectuate a lasting change in her circumstances." Mother's brief fails to contain any argument relating to this issue; consequently, she has waived the issue. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. R. Ct. App. 6. Notwithstanding, we have reviewed the transcript, which shows that Mother's attorney engaged in vigorous cross examination of witnesses and secured additional time to submit documentation to the court regarding Mother's attempts to comply with the permanency plans; the order shows that the court considered the documents which were submitted on her behalf. Upon the record presented, the actions of her counsel did not prevent Mother from receiving a fundamentally fair proceeding. *See In re Carrington H.*, 483 S.W.3d 507, 535-536 (Tenn. 2016) *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016) (in which the Tennessee Supreme Court analyzed a parent's claim of ineffective assistance of counsel by determining whether the actions of counsel prevented the parent from receiving a fundamentally fair proceeding).

consider whether the evidence clearly and convincingly establishes that each ground upon which the court terminated the parents' rights. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016) ("[I]n an appeal from an order terminating parental rights[,] the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

## IV. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in

the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## V. ANALYSIS

### A. Grounds for Termination

#### 1. Abandonment by Engaging in Conduct that Exhibits Wanton Disregard

Tennessee Code Annotated section 36-1-102(1)(A)(iv) defines abandonment, in pertinent part, as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or *the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.*

(Emphasis added.) As this Court stated in *In re Audrey S.*:

> [The above statutory definition] reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. However, parental incarceration is not an infallible predictor of parental unfitness. . . the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Both Mother and Father's undisputed criminal history prior to their present incarceration, particularly that involving methamphetamine, evidences their wanton disregard for the welfare of Eli. The fact that

Mother allowed methamphetamine to be manufactured in the home where her child resided underscores the conduct prior to incarceration that posed a risk of substantial harm to the Eli's welfare. In addition to his involvement with drugs, the revocation of Father's probation shows a broader pattern of conduct that poses a substantial risk of harm to Eli. We conclude that the record contains clear and convincing evidence establishing this ground for termination.

## 2. Substantial Noncompliance with the Permanency Plans

The statute setting forth the ground of "substantial noncompliance" reads: "There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." Tenn. Code. Ann. § 36-1-113(g)(2). In *In re C.M.*, this Court said that, in order "[t]o carry its burden of proving this ground, DCS must show" the following:

> [T]hat the permanency plan includes a "statement of responsibilities" that "clearly communicate[s] to the parent: 'this is what you must do to regain custody of your child.'" . . . DCS must also show that the permanency plan's requirements are "reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." . . . Further, DCS must demonstrate that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met."

No. E2018-02108-COA-R3-PT, 2019 WL 3812421, at *4-5 (Tenn. Ct. App. Aug. 14, 2019) (internal citations omitted).

The two permanency plans in the record were created in August 2017 and March 2018 and were ratified by the court; Mr. Linton testified that "the initial perm[anency] plan was developed within the first 30 days." Both parents testified that they had the plans explained to them by Department case workers. Both plans contained the following responsibilities for both parents: complete an alcohol and drug assessment and follow all recommendations; complete a mental health intake and follow all recommendations; resolve all outstanding legal issues; submit to random drug screens; not expose Eli to any persons who are intoxicated or have a history of violence; secure housing that is appropriate and safe environmentally; have the financial means to support Eli. Neither parent challenges the requirements of the permanency plans.

Father does not dispute that he signed and understood the terms of the permanency plans and that he has failed to comply with all requirements. Similarly, while Mother testified she had made "significant progress in complying with the conditions set forth in the Permanency Plans," the record makes clear that many important ones remained incomplete as of the time of trial; the record does not show, for instance, any drug or

mental health assessment, or counseling or treatment in accordance with the recommendations stemming from such an assessment, Mother received while in prison. Mother does not challenge the requirements of the permanency plans, which the trial court found, and the record supports, were reasonable and related to remedying the conditions that caused Eli to be removed from Mother's custody; the requirements in the plan addressed the drug-related behaviors that led to the parents' incarceration as well as the familial consequences of those behaviors. The tasks that were to be performed were substantial and, left uncompleted, the parents' noncompliance was substantial. This court has held that substantial noncompliance with a permanency plan does not have to be willful to justify termination of parental rights. *In re Joseph L.*, No. M2011-02058-COA-R3-PT, 2012 WL 2389609, at *9 (Tenn. Ct. App. June 25, 2012). Accordingly, we hold that the record clearly and convincingly supports a holding that termination was warranted on the ground of both parents' substantial noncompliance with the permanency plan.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody

A parent's rights may be terminated on the ground that:

[a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the party seeking termination of a parent's rights to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, the party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, the party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court held that a party seeking to terminate a parent's rights must prove by clear and convincing evidence that the parents failed to manifest both an ability and a willingness to personally assume legal and physical custody of the child or that they failed to manifest an ability and a willingness to personally assume financial responsibility for the child. When evaluating ability, we focus "on the parent's lifestyle and circumstances." *Id.* "When evaluating willingness, we look for more than mere words." *Id.* Rather, a parent must have demonstrated

willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.*

In light of the above standards and the evidence in the record, we agree with the trial court that Mother's history of drug abuse and both parents' repeated criminal conduct and resulting incarceration demonstrates that each lacks the ability to parent Eli.

As to the parents' willingness to assume physical and legal custody, Father's testimony in this regard occurred during a discussion of Eli's best interest; Father stated that it was for Eli "to be with someone who actually knows him from the time of birth and someone who's gonna take care of him like . . . he is their own child[; . . . that is my only child and ain't nobody gonna love that boy the way I do." He testified that he has "been accepted into a halfway house" and that his "sister is able to get [Eli]." We do not discern from this testimony a willingness on the part of Father to assume custody of Eli, which necessitates a willingness to make necessary life changes and adjustments to accommodate raising a child. We conclude that the record supports the determination that Father did not demonstrate a willingness to assume Eli's custody, and sustain this ground for termination of his rights.

For her part, Mother testified that once she was paroled, she planned to join the re-entry program at Doors of Hope, which requires a commitment of at least six months; she testified that after completion of the program, she would be able to get a home of her own so that she would "be able to provide a place for my child." This testimony shows that that Mother was willing to take custody of Eli in the future but did not have, and would not have for at least six months following her uncertain release date, the ability to take physical custody of Eli. Given the need to prove that Mother had failed both to manifest an ability and a willingness to assume custody, we conclude that DCS failed to prove that Mother was unwilling to assume custody.

As we consider the second element of this ground, substantial risk of harm, we are guided by the holding in *Ray v. Ray*:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

In this case, both parents are currently incarcerated and, for purposes of this analysis, Eli would not be able to be returned to the custody of either parent. Father's history of criminal activity and repeated incarcerations, prompted by violating his probation, is strong evidence of a "real hazard or danger that is not minor, trivial, or insignificant" if Eli were returned to him. *See In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019) (holding that "placing a child with a parent who ha[s] knowingly engaged in repeated criminal conduct that necessitated [the parent's] re-incarceration would place the child at risk of physical or psychological harm.") (quoting *In re Amynn K.*, 2018 WL 3058280, at *15). With respect to Mother as we consider this ground, however, the evidence is not clear and convincing that "a reasonable person [would] believe that harm will occur more likely than not" if Eli were returned to her custody.[8]

Accordingly, we conclude that there is clear and convincing evidence supporting termination of Father's parental rights on this ground, but not Mother's.

### 4. Severe Child Abuse

Tennessee Code Annotated section 36-1-113((g)(4) states as a ground for termination of parental right that "[t]he parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102 . . . against the child who is the subject of the petition. . .". In turn, section 37-1-102(b)(22)(D)(2016), in effect when the petition was filed, defines "severe child abuse" to include "[k]nowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring." Evidence as to this ground for termination came from the testimony of Mother and Ms. Presnell, who both testified about the manufacture of methamphetamine that took place at the home where Eli resided. In addition, the order adjudicating Eli dependent and neglected stated that "The mother, Savannah [S] waives the Adjudicatory Hearing and stipulates that the facts alleged in the Petition . . . are true, and further that those facts constitute severe child abuse"; as counsel for the Department represented at the hearing and the court so held, that order was not appealed. This is clear and convincing evidence supporting termination of Mother's rights on the ground of severe child abuse.

### 5. Remaining Grounds

Turning to the remaining grounds upon which termination of both parents' rights was based, the Department has elected to not defend the trial court's holdings of

---

[8] This holding is limited to this ground for termination and has no bearing on our consideration of whether termination of Mother's rights is in Eli's best interest, which is made from the perspective of the child, not the parent. See *White v. Moody*, 171 S.W. 3d. 187 (Tenn. Ct. App. 2004).

abandonment by failure to provide a suitable home[9] and the persistence of conditions[10] as to both parents; with respect to Father, the Department has also elected not to defend the ground that he was incarcerated under a sentence of confinement of ten years or more. Upon our review of the evidence, as set forth below, we agree that those grounds are not clearly and convincingly established.

The grounds of abandonment by failure to provide a suitable home and persistence of conditions each require that the child be removed from the home of the parent in order to serve as a ground of termination. *In re Navada N.*, 498 S.W.3d 579, 597 (Tenn. Ct. App. 2016); *In Re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at

_____

[9] Tennessee Code Annotated section 36-1-102(1)(A)(ii), as worded when the petition was filed, defines abandonment in this regard as follows:

> (ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

[10] The statutory ground commonly referred to as "persistence of conditions" is set forth at Tennessee Code Annotated section 36-1-113(g)(3), which reads as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

- 14 -

*10 (Tenn. Ct. App. June 23, 2015), *perm. app. denied* (Tenn. Sept. 25, 2015). Father testified that he has been incarcerated since August 7, 2016; thus he was not living in the home, and had not been for several months, at the time Eli was removed from Mother's care and placed in protective custody. Thus, these grounds are inapplicable to Father.

As to Mother, we note that her incarceration prevented her from being able to make efforts to provide a suitable home and precluded DCS from assisting her in establishing a suitable home. Accordingly, the ground of abandonment by failure to provide a suitable home was not clearly and convincingly established as to Mother. *See In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *7 (Tenn. Ct. App. July 13, 2015) (holding that "this ground is inapplicable . . . when [the child] was removed from [the other parent]'s care and when DCS admittedly could not assist Father in establishing a suitable home while he was incarcerated."). With respect to the ground of persistence of conditions, the was no evidence that Mother's manufacturing of methamphetamine persisted since she has been incarcerated and, due to her incarceration, no assessment could be made as to whether the conditions prior to her arrest persisted. Accordingly, the elements of the ground of persistence of conditions were not clearly and convincingly established as to Mother.

As to section 36-1-113(g)(6), which requires that the parent or guardian be "confined in a correctional or detention facility of any type . . . under a sentence of ten (10) or more years" and that the child be under eight years of age, the evidence shows that Father's four-year sentence, while consecutive to his eight-year sentence, was to be served on probation. Accordingly, the evidence does not support termination of Father's rights on this ground, as he was to be confined in a correctional facility for only eight years.

In summary, we reverse the trial court's holdings with respect to the ground of abandonment by the failure to provide a suitable home as to both Mother and Father, the ground of persistence of conditions as to both Mother and Father, the ground of failure to manifest an ability and willingness to assume custody as to Mother and the ground of confinement under a ten-year sentence as to Father. We affirm the holdings that the evidence clearly and convincingly established the grounds of abandonment by engaging in conduct that exhibited a wanton disregard for Eli's welfare as to both parents, substantial non-compliance with the permanency plans as to both parents, failure to manifest an ability and willingness to assume custody as to Father, and as to Mother, the ground of severe child abuse was also clearly and convincingly established.

## B. Best Interest Determination

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard.

*In re Valentine*, 79 S.W.3d at 546. The Legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[11] The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at \*3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at \*4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in

---

[11] The factors at Tennessee Code Annotated section 36-1-113(i) are:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

In the case at bar, the trial court made the following findings with respect to Eli's best interest:

> The Court concludes that Tenn. Code Ann. §36-1-113(i)(1) is present in that Respondents [Father] and [Mother] have not made such an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in their homes; that Tenn. Code Ann. §36-1-113(i)(4) is present in that there is no meaningful relationship between Respondents, [Father] and [Mother], and the child; that Tenn. Code Ann. §36-1-113(i)(5) is present in that a change of caregivers resulting in a return to Respondents at this stage of the child's life will have a detrimental effect on the child; that Tenn. Code Ann. §36-1-113(i)(6) is present in that Respondent [Mother], has shown abuse toward the child, Eli A[.] S[.]; and that Tenn. Code Ann. §36-1-113(i)(7) is present in that the physical environment of the Respondents' homes are not healthy and safe for the child, there is criminal activity in each parent's home, and there is such use of alcohol, controlled substances or controlled substance analogues as may render the parents consistently unable to care for the child in a safe and stable manner.

> Finally, the Court concludes that termination of Respondents' parental rights to the child, Eli A[.] S[.], is in the child's best interest because the child has established a strong bond with his foster parent who wishes to adopt him.

On appeal, Father does not make any argument with respect to the trial court's holding that termination of his rights is in Eli's best interest. The record shows that, throughout Eli's life, Father has engaged in conduct that is not only detrimental to himself, but which demonstrates that he has no intention to establish a meaningful parent-child relationship with Eli; he does not contest that termination of his rights is in Eli's best interest. We conclude that the holding is supported by clear and convincing evidence.

Mother argues:

> [T]here was scant proof offered on the best interest of the child with no evidence offered regarding the health needs, educational needs or psychological needs of the child. There was no testimony given as to the

effect that a change of caregivers would have on the child at this time. There was no evidence of any sort to show any detrimental effect in failing to terminate the parental rights of Appellant.

Having considered Mother's arguments and thoroughly reviewed the proof, we conclude that the preponderance of the evidence supports the trial court's findings. The record shows that Mother's home, from which Eli was removed, was not a safe place, given the criminal conduct of both parents and Mother's drug abuse and the manufacturing of methamphetamine to which Eli was exposed. In addition, both parents are currently incarcerated, which has resulted in not developing a relationship with Eli, a lack of visitation and failure to provide any sort of support for Eli, who deserves the stability, permanence, and safe, loving home that is available to him. Contrary to Mother's arguments, Mr. Linton testified that removing Eli from the home would be a "shock" to him, and in light of the testimony of Ms. J. and the Department's case workers, there is clear and convincing evidence in the record from which to conclude that Eli's health needs have been addressed and that he is thriving mentally, physically, and emotionally in his current pre-adoptive home, where he has a strongly bonded relationship with the foster parent. The combined weight of the facts is clear and convincing evidence that it is in Eli's best interest to terminate the parental rights of Mother and Father.

## VI. CONCLUSION

In light of the foregoing, we reverse the termination of Mother's and Father's parental rights on the grounds of abandonment by the failure to provide a suitable home and persistence of conditions, the ground of failure to manifest an ability and willingness to assume custody of Eli as to Mother, and the ground of incarceration under a sentence of more than ten years as to Father. We affirm termination of both parents' rights on the grounds of abandonment by engaging in conduct that exhibits wanton disregard for the welfare of the child and substantial non-compliance with the permanency plans; with respect to Father, we affirm termination on the additional ground of his failure to manifest an ability and willingness to assume custody of Eli; and we affirm the termination of Mother's rights on the ground of severe child abuse. We affirm the holding that termination of both Mother and Father's parental rights is in Eli's best interest.

_____
RICHARD H. DINKINS, JUDGE

- 18 -